[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-15694
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 8, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 08-00026-CR-T-24-MSS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS A. COSSIO,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 8, 2009)

Before BLACK, BARKETT and PRYOR, Circuit Judges.

PER CURIAM:

Luis A. Cossio appeals his convictions for conspiracy to manufacture 100 or more marijuana plants, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), 846, and manufacturing 100 or more marijuana plants, id. §§ 841(a)(1), (b)(1)(B)(vii); 18 U.S.C. § 2. Cossio challenges the denial of his motion to suppress, which we affirm, and the effectiveness of his trial counsel, which we decline to review.

## I. BACKGROUND

Detectives Corey Hover and Corey Lanier investigated whether a house located at 1380 Northwest 36th Street in Winter Haven, Florida, was being used to cultivate marijuana. When the detectives approached the house, they noticed that boards covered the windows. While Detective Hover knocked on the front door, Detective Lanier walked into the backyard, where he noticed two large air conditioners sitting on the ground and a third unit installed in a window of the house. Based on similar investigations, Detective Lanier knew that growers commonly used air conditioning to maintain a constant temperature for the marijuana plants.

After Detective Lanier returned to the front of the house, Detective Hover knocked on the front door, and Cossio opened the door and joined the detectives on the porch. When Cossio later opened the door briefly to yell to other occupants in Spanish, Detective Hover noticed a board with a metallic side inside the house.

2

Detective Hover knew that boards with metallic sides were used to reflect light on marijuana plants and asked Cossio for permission to search the house. After Cossio refused consent, Detective Lanier assumed control of the conversation while Detective Hover walked to the side of the house, where he smelled marijuana, and proceeded to the back of the house where he observed the air conditioners.

Detective Hover returned to the front porch, spoke to Detective Lanier about his observations, and the detectives decided to request a search warrant. While they waited for the warrant, the detectives entered the house to secure evidence and search for possible weapons. The detectives discovered two men hidden in a grow room and moved them to the carport.

When officers later executed the search warrant, they discovered that the interior of the house, except a kitchen that contained a small bed and an adjoining bathroom, had been converted to grow marijuana. Some of the interior walls had been removed, metallic sheets covered the walls, and an irrigation system had been installed to water and fertilize the marijuana plants. The officers seized 138 marijuana plants from the house. Cossio was indicted for conspiracy to manufacture 100 or more marijuana plants, 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(vii), 846, and the manufacture of 100 or more marijuana plants, id.

§§ 841(a)(1), 841(b)(1)(B)(vii); 18 U.S.C. § 2.

Cossio moved to suppress the drug evidence discovered in what he alleged was a residence owned by Raul Santana. Cossio argued that he had standing to challenge the search because he had an expectation of privacy. Cossio based his argument on two grounds: the search warrant stated that he was the primary occupant of the residence and he was the caretaker of the residence. The government argued that Cossio was a visitor and lacked standing to challenge the search.

At the motion hearing, counsel for Cossio argued that he had standing based on statements by Detectives Hover and Lanier in the police report that described Cossio as an occupant and caretaker, but the district court ruled that Cossio was required to produce evidence that he kept belongings and had spent the night at the residence. Detective Hover testified that he had described Cossio as an occupant and caretaker because Cassio had answered the door and told the detectives that he had been maintaining his brother's house.

Cossio and the government provided different accounts about Cossio's refusal to consent to a search. Detectives Hover and Lanier testified that Cossio said he did not live in the house and refused consent because his brother owned the residence. Cossio denied that statement and testified that he had refused to open

the door unless the detectives produced a search warrant, but Cossio later testified that he told the officers, "house of my brother, but if you have one paper, . . . me open the door."

Cossio's testimony was rife with inconsistencies. Cossio explained that there were two separate spaces in the house composed of "a rented house and a little house on the [right] side" that had separate entrances. Cossio stated that the spaces had an internal door that remained locked, but he later testified that the growers had access to both sides of the house. Cossio testified that he stayed in a one-room apartment on the right side of the house while the growers stayed on the left side of the house, but he later testified that the growers stored personal property in the apartment and slept there. Cossio stated that he was restricted to the right side of the house, but he knew that the other side of the house was used to cultivate marijuana.

Cossio equivocated about how frequently he occupied the apartment. Cossio first testified that he mowed grass at the residence as part of his landscaping business and arrived at the house that morning to complete his work when the detectives arrived, but he later testified that he had spent the night in his apartment. Cossio testified that he did not live in the apartment but kept a television and clothes there and would stay overnight when the house was not occupied, but he

5

testified that he had stayed at the apartment when the other side was occupied. When later questioned by the district court whether he ordinarily spent the night at the residence, Cossio responded, "no, just that night" and on one other occasion about six months earlier. In response to Cossio's numerous contradictions, the district court remarked, "[t]he story keeps changing a little, so it's sort of like following a bouncing ball here."

Cossio argued that he had a subjective expectation of privacy in the residence as an overnight guest that extended to the side where the marijuana was grown because he was the "caretaker" for the residence, "the entire property was under one roof[,]" and "[t]here was common access." The government countered with three arguments: (1) Cossio lacked standing because he had told the police he did not live in the house and it belonged to his brother; (2) if Cossio had spent one night in the house, he did not have standing to challenge the search of the side of the house where marijuana was cultivated; and (3) Cossio did not have standing because he was on the premises for commercial, instead of personal, reasons.

The district court denied Cossio's motion to suppress. The court discredited Cossio's testimony that he had spent the night at the house and ruled that his presence to cut the lawn was insufficient to convey standing. The court ruled in the alternative that even if it credited Cossio's testimony, Cossio lacked standing to

6

challenge that portion of the house where marijuana was discovered. The court issued a written order that contained three findings of fact: the residence was owned by Raul Santana; Cossio lived at a different residence; and Cossio's testimony that he spent the night in Santana's house was not credible.

The case proceeded to trial and Alvaro Mejia-Solares testified about Cossio's participation in the marijuana operation. Mejia-Solares testified that Cossio instructed him how to care for the marijuana plants; delivered food three or four times to the house; and took some small marijuana plants four days before the search and seizure. Mejia-Solares testified that Cossio "arrived like 20 minutes before the arrest."

## II. STANDARDS OF REVIEW

On denial of a motion to suppress, we review findings of fact for clear error and the application of law to those facts de novo. United States v. Ramirez, 476 F.3d 1231, 1235 (11th Cir. 2007). We construe all facts in the light most favorable to the government. Id. at 1235–36.

## III. DISCUSSION

Cossio raises issues related to his motion to suppress. Cossio argues that he had a reasonable expectation of privacy in the residence as an overnight guest or, alternatively, as the caretaker of the property. Cossio also raises an issue of

7

ineffectiveness in which he argues that counsel failed to investigate whether the search warrant was possibly forged. We decline to address Cossio's argument of ineffectiveness because there is no evidence in the record about what, if any, steps counsel took to investigate the warrant. See United States v. Bender, 290 F.3d 1279, 1284 (11th Cir. 2002). That issue can be reviewed in a postconviction motion. 28 U.S.C. § 2255.

The district court did not err when it denied Cossio's motion to suppress. The district court was entitled to discredit Cossio's inconsistent and implausible testimony and conclude that Cossio lacked standing to challenge the search. See United States v. Ramirez-Chilel, 289 F.3d 744, 749 (11th Cir. 2002). Even if we were to credit Cossio's testimony, his argument would fail. Cossio failed to prove he had "an unrestricted right of occupancy or custody and control of the premises" that would create a legitimate expectation of privacy in the area of the house where the marijuana was discovered. United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (quoting United States v. Bachner, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983)). Cossio did not have standing to challenge the search of the residence.

## IV. CONCLUSION

Cossio's convictions are **AFFIRMED**.